**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA**

**CASE NO.**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

RAD DIVERSIFIED REIT, INC.,
BRANDON "DUTCH" MENDENHALL, and
AMY VAUGHN,

      Defendants; and

THE SEMINAR SOLUTION, LLC,

      Relief Defendant.

_____/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## I.   INTRODUCTION

1.   The Commission brings this action to enjoin RAD Diversified REIT, Inc. ("RADD"), headquartered in Tampa, Florida, and its founders Brandon "Dutch" Mendenhall and Amy Vaughn (collectively, "Defendants") from

committing further violations of the anti-fraud and securities registration provisions of the federal securities laws.

2.     From November 2019 through March 2024 ("Relevant Period"), Defendants raised at least $152 million from more than 5,500 retail investors nationwide through an unregistered fraudulent securities offering. During the Relevant Period, RADD raised investor funds through both its stock offerings and investments offered through its "Inner Circle" program, all while systematically deceiving investors about RADD's profitability, the valuation of its stock, and its liquidity. Defendants' conduct has caused financial hardship to thousands of investors nationwide and has jeopardized many of their retirement savings. Many investors were not accredited. Defendants, directly and through RADD's sales agents, encouraged investors to invest by withdrawing funds from their self-directed IRAs, using credit cards, taking out home equity loans, or using life insurance proceeds.

3.     Defendants led investors to believe that RADD was a profitable real estate investment trust ("REIT") that generated substantial revenue from rental income and sales of refurbished properties, and that it paid cash dividends from those profits. Defendants ran an extensive marketing campaign across social media, in-person meetings, and through unregistered sales agents using high-pressure sales tactics. Defendants invoked themes of Christian values and

2

patriotism to create a sense of trust and security for investors. In prolific social media promotions and sales scripts prepared by Defendants and used by their agents, Defendants repeatedly claimed that "zero investors have ever lost money on their investment" and "none of our Inner Circle partners have ever lost money."

4. Contrary to their representations, however, Defendants knew that RADD's financial picture was bleak, with millions of dollars in annual losses reflected in internal profit-and-loss statements.

5. Defendants also touted RADD's ever-increasing stock price, which purportedly increased 150% from 2019 to 2023. Defendants gained investors' confidence by routinely and repeatedly asserting that RADD's stock price was based on objective, independent valuations of the REIT's properties, calculated by external accountants, and would be regularly updated. These assertions were false. RADD used Mendenhall's brother, who was RADD's Vice President of Real Estate Operations yet had no meaningful property valuation experience, to perform the valuations. And no third-party appraiser, evaluator, or accountant, participated in the determination of RADD's stock price.

6. Defendants boasted about RADD's liquidity and gained investors' confidence by assuring them that if they were not satisfied, they could redeem their investments through an established process. In truth, Defendants routinely

denied or ignored investors' redemption requests because RADD lacked sufficient liquidity to honor them. In February 2024, RADD froze stock redemptions.

7.    Together with RADD's stock offerings, Defendants promoted access to an "exclusive" investment group, RADD Inner Circle, which purportedly provided members access to invest in Hard Money Loan notes ("HML Notes") promising 20% returns and joint venture real estate deals ("JV Agreements"), each not otherwise available to non-members. In truth, these opportunities were neither exclusive nor capable of producing the returns Defendants claimed.

8.    On top of their misrepresentations to investors, Defendants diverted approximately $54 million of RADD investor funds into the bank accounts of an affiliated entity owned and managed by them, The Seminar Solution ("TSS"). Through this scheme, Mendenhall misappropriated approximately $2.3 million and Vaughn misappropriated approximately $2.5 million in investor funds. They used these misappropriated investor funds to pay for personal expenses, such as IRS tax obligations, private jet charters, high end jewelry and clothing, and various recreational and personal expenses.

9.    By engaging in the conduct alleged in this Complaint, Defendants have violated, and unless enjoined, are reasonably likely to continue violating, Sections 5(a), 5(c), and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c); § 77q(a)], and Section 10(b) of the Securities  Exchange

4

Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## II.    DEFENDANTS AND RELIEF DEFENDANT

### A. Defendants

10.    **RADD** is a Maryland corporation formed in 2017, and its principal place of business during the Relevant Period was in Tampa, Florida. RADD is a REIT that raised at least $152 million from over 5,500 investors. RADD has never been registered with the Commission. On March 1, 2026, RADD filed a Voluntary Petition for Bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in the Middle District of Florida, *In re RAD Diversified REIT, Inc.*, 8:26-bk-01636 (Bankr. M.D. Fla. Mar. 1, 2026) (jointly administered with associated cases 8:26-bk-01637 through 8:26-bk-01640) ("Voluntary Petition for Bankruptcy").

11.    **Mendenhall,** 47, is a resident of Tampa, Florida, and is RADD's Chief Executive Officer, President, Director, co-owner, and co-founder. Mendenhall also is an owner of TSS and RADD's investment manager, RAD Management, LLC ("RAD Management"). Mendenhall has never held any securities licenses and has never been registered with the Commission in any capacity, nor associated with a registered entity.

12.    **Vaughn**, 48, is a resident of Tampa, Florida, and a Director, co-founder, and co-owner of RADD. Vaughn also is an owner of TSS and RAD

Management. Vaughn has never held any securities licenses and has never been registered with the Commission in any capacity, nor associated with a registered entity.

### B. Relief Defendant

13.    **TSS**, a Nevada limited liability company, with its principal place of business in Tampa, Florida, operated out of the same office space as RADD during the Relevant Period. It is owned by Vaughn and Mendenhall and employed sales agents selling investments in RADD. Since 2020, TSS has received approximately $34 million in direct deposits of RADD investor proceeds, in addition to a net of approximately $20 million of commingled investor funds transferred from RADD.

### III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

15.    This Court has personal jurisdiction over Defendants and the Relief Defendant and venue is proper in the Middle District of Florida because: (a) Mendenhall and Vaughn reside in this District; (b) RADD's principal place of business was in this District; (c) a portion of RADD's real estate, purchased with investor funds, is located in this District; (d) a substantial part of the events or

omissions giving rise to the violations of the Securities Act and the Exchange Act occurred in the District; and (e) TSS was located in this District and received funds directly from RADD.

16.　In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.　FACTUAL ALLEGATIONS

### A. RADD's Business and Securities Offerings

#### 1. RADD's REIT and Stock Offerings

17.　Defendants marketed RADD as a REIT that purchased, renovated, and leased income-producing residential properties across the United States. A REIT is a company that owns or finances real estate that generates income. Investors buy shares and can earn dividends and overall returns without having to purchase, renovate, manage, or finance properties themselves. RADD's REIT was a non-traded REIT, thus its shares were unavailable on a public stock exchange for purchase or sale.

18.　RADD's website prominently illustrated its business model under the banner "How it Works":



Thus, RADD purportedly would use investor funds to purchase and refurbish distressed properties, collect rents from tenants in those properties, and pay investors cash dividends from rental proceeds.

19.    Mendenhall described RADD as "real estate done for you." Defendants exercised exclusive control over RADD's daily operations and in selecting properties to acquire and develop. The properties RADD purchased for the REIT were located primarily in Pennsylvania and Florida, with additional properties in Texas, California, New Jersey, Idaho, and Delaware, totaling more than 550 properties at the REIT's peak. As reflected in this 2022 investor presentation, Defendants assured investors, "We handle everything.":



20.     During the Relevant Period, RADD raised approximately $104 million from investors through stock offerings in the REIT. RADD provided investors and prospective investors with (1) offering circulars signed by Mendenhall, Vaughn, and others; (2) Private Placement Memorandums ("PPMs"); and (3) subscriptions agreements (collectively, "Offering Materials"). RADD stock investors deposited their funds into RADD's operating accounts. RADD's stock are securities under the Securities Act and Exchange Act and are described as such in RADD's Offering Materials.

### 2. RADD Inner Circle's Program, and Defendants' Offer and Sale of Investments in HML Notes and JV Agreements

#### a.  RADD Inner Circle

21.     RADD promoted its "RADD Inner Circle" membership as a $50,000 "exclusive" entry into RADD's top investment opportunities, including high interest HML Notes and JV Agreements. In practice, however, Defendants often

accepted far less and encouraged investors to pay the membership fee via credit card.

22.     Mendenhall stated that there was a "marriage" between the REIT and RADD Inner Circle and touted its purported "elite" status, as shown here:



23.     To join, investors executed a Memorandum of Understanding ("MOU") with a fictitious entity Defendants called "RADD Inner Circle" and signed by Mendenhall or another RADD executive. The MOUs did not have investor qualification questions. The MOUs directed investors to wire their funds to RADD Inner Circle's bank account. However, the bank account was in the name of Mendenhall and Vaughn's other company—TSS. Investors believed they were remitting fees to invest in RADD's top investment opportunities and were not familiar with TSS.

24.    Just as with RADD's stock offerings, Defendants marketed RADD's Inner Circle program, including HML Notes and JV Agreements, as "Real Estate Done For You," and portrayed Inner Circle as a path to wealth, as demonstrated here:




b.  HML Notes

25.    From March 2022 through March 2024, RADD raised approximately $23 million from selling the HML Notes to over 200 investors nationwide. Defendants promoted the HML Notes, signed by Mendenhall or another representative on behalf of RADD, as an investment opportunity for RADD Inner Circle members to earn high interest returns. Defendants sold the HML Notes to raise capital for RADD's general business use and to finance substantial investments. In turn, the investors purchased the HML Notes to make a profit generated by RADD's business and in the form of higher than market-rate interest.

The HML Notes were offered and sold to the public through RADD's website and online social media marketing campaigns directed toward the public at large.

26.     With RADD as the loan beneficiary, HML Notes typically were an 18-month term, and on the seventh month, investors were supposed to begin receiving their principal back monthly on an annualized basis, along with 20% interest per month for the remainder of the unpaid principal. If not timely repaid, RADD was required to pay investors an additional 1% of the outstanding balance per month until the HML note was repaid in full. Investors were instructed to wire their funds into bank accounts in the name of RADD and RADD Inner Circle, but which were actually designated for wiring to TSS's accounts.

27.     The HML Notes are securities in the form of notes under the Securities Act and Exchange Act. Investors in HML Notes, whose role was limited to investing in them, depended on Defendants to successfully operate and manage RADD to enable investors to achieve the promised returns. Investors understood that RADD would use the HML Notes to further its real estate ventures, over which investors exercised no control. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the HML Notes' securities and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

c. JV Agreements

28.    From at least November 2019 through March 2024, RADD raised approximately $16.5 million from selling the JV Agreements, signed by Mendenhall or other RADD representatives. RADD received investor funds from the JV Agreements into its main operating account. Defendants promoted the JV Agreements as an opportunity for RADD Inner Circle members to partner with RADD in real estate investment deals. Under the JV Agreements, RADD and the investors were to equally split the cost to acquire and renovate the properties and equally split rental payments and sales profits.

29.    The JV Agreements are securities in the form of investment contracts under the Securities Act and Exchange Act. RADD provided investors with pre-selected lists of properties to invest in that were located exclusively through the efforts of RADD. Mendenhall described JV Agreements as "hands-off," and said RADD would do all renovations and handle all aspects of rentals and sales. The JV Agreements stated that RADD would act as agent to operate the business venture and "solely make all decisions" on the properties and joint venture. The investors' roles were limited to investing money in the JV Agreements, and they had no actual or legal authority to exercise entrepreneurial or managerial control over the investments to generate profits. Defendants pooled investors' funds into

bank accounts they controlled. Investors' returns depended entirely on Defendants' performance and management.

**B. Defendants' Solicitation of Investors**

30. Defendants prolifically marketed RADD investments in its stock, HML Notes, and JV Agreements using RADD's website, YouTube videos, podcasts, social media posts, in-person seminars, its Offering Materials, and through its team of sales agents. Advertisements for RADD investments appeared on investors' Facebook feeds, their IRA account platforms, and online investing newsletters. When investors clicked on the links, they were directed to RADD's website, which described how investors could make money by buying shares of RADD stock and investing in HML Notes and JV Agreements available exclusively through the RADD Inner Circle.

31. Defendants talked about Christian values and Mendenhall made comments about his deep faith which gave investors comfort and encouraged them to trust RADD. Defendants also emphasized patriotism, routinely included references to America and images of the American flag in RADD's social media content, and talked about the importance of helping military veterans, which resonated with investors. RADD's Instagram handle was "@redefineamericandream," with a tagline, "We're a cultural and financial

14

shifting of consciousness for Americans. If you don't love this country, go somewhere else." RADD's Instagram invoked all these themes, as seen here:



32.    In publicly available videos and podcasts, Mendenhall touted RADD's positive returns, the money RADD purportedly made for investors, and RADD's cash flow from rental income. He described RADD as a "cash company" that "makes money." He also emphasized RADD's ever-increasing stock price. In a June 2022 email to investors, Mendenhall wrote, "As of today, our REIT has reached a value of $20.03 per share! Let that sink in… we have doubled the equity of our REIT investors' shares in less than 3 years. Since its inception in September 2019, that marks an increase of 100.3%." A large button at the end of the email above Mendenhall's picture invited recipients to the email to "Invest Now!"

15

33.     RADD employed approximately 60 internal sales agents to solicit investors to invest in RADD's stock, HML Notes, and JV Agreements. The sales agents used RADD's sales materials, approved by Vaughn, whom Mendenhall nicknamed "Sales Goddess," and likewise characterized RADD as a thriving company. Sales scripts instructed sales agents to leave investors and prospective investors repeated voicemails, text messages, and emails. Defendants repeatedly stressed that salespersons should emphasize the returns on investment that RADD purportedly provided and that time was of the essence to invest.

34.     In a publicly available sales meeting video posted on LinkedIn during the Relevant Period, Mendenhall and Vaughn sat side-by-side at the head of the table talking to sales agents, as seen here:



Mendenhall, with Vaughn nodding along in acknowledgment, directed the sales agents in soliciting investors to take the following approach:

I think when you're on the phone and you're selling the REIT or you're selling our Inner Circle you have to make—have that same kind of commitment level towards the sale. Right? And—and you also have to have an attitude like—like, if you don't get it, you're a f**king idiot. Right?

. . .

And our[]—thing is so much better than anything else that is out there. There's nothing even close to it from a comparative standpoint. Right? Nobody has the kind of returns we have.

35. Defendants also conducted "Investor Wealth Summits" during which they promoted RADD's investments and provided financial education. Mendenhall and Vaughn directly solicited investors at these summits.

36. Defendants' marketing campaign worked—they convinced more than five thousand retail investors to invest more than one hundred million dollars in RADD in less than five years. As detailed below, however, Defendants painted a false picture of RADD's business, all while Mendenhall and Vaughn helped themselves to nearly five million dollars in investor funds.

## C. Defendants' Violations of the Anti-Fraud Provisions of the Federal Securities Laws

### 1. *Material Misrepresentations*

a. <u>RADD Was Not a Profitable Business Sustained By Its Real Estate Operations</u>

37. Defendants repeatedly and consistently represented during the Relevant Period that RADD was profitable and had a net positive cash flow. These

statements were false and omitted material facts about RADD's deteriorating financial condition and inability to secure credit.

38. Mendenhall emphasized that RADD was a thriving, profitable, and cash-flowing business. For example, in a March 2022 video entitled, "Being Burned," Mendenhall stated, "The bottom line is our real estate investment trust is one that invests and makes money. It's been proven year after year after year as a company doing business in the marketplace." In a January 2023 video entitled, "Power of RAD," Mendenhall stated that RADD would "thrive during the worst of economic times" and was not affected by the stock market. In a September 2023 podcast, he stated, "We are a cash company. We build up our cash. We have more, you know, money coming in monthly than most people can imagine."

39. Sales agent scripts approved by Vaughan touted that RADD invested in assets "that rent, that [produce] cashflow and make money," and emphasized investors receiving monthly income and retirement funding.

40. RADD's sales manual instructed sales agents to repeat representations to investors such as "[W]e have cash flow, we appreciate it, we make money and we do it again and again." RADD's sales manual, sales scripts, and social media stated that "zero investors have ever lost money on their investment." Defendants sent mailers to investors that boasted, "Since inception, [RADD has] had a return of 140.80%."

18

41.     Yet, since at least 2022, RADD was in dire financial condition, which Defendants knew.

42.     At the time that Mendenhall painted a rosy picture of RADD to investors, Mendenhall knew that RADD's rental income and real estate sales did not cover RADD's operating expenses from 2022 through 2024; he knew that RADD relied on financing and raising new investor funds to operate; and he knew that RADD had net operating losses from 2021 through 2024. But he did not disclose these facts to investors while mispresenting RADD's financial condition.

43.     Indeed, Mendenhall received financial and cash flow reports in 2022 and 2023 showing RADD was receiving little to no rental income in 2022 and 2023. Mendenhall also received several text messages from RADD's accounting department on a periodic basis containing a dashboard of current balances in RADD's bank accounts and current and projected expenses, which revealed RADD was receiving little to no rental income.

44.     In late 2022, Mendenhall met directly with representatives of a bank to apply for a $15 million line of credit. RADD provided the bank with copies of its internal financial statements for the loan application. In response, on February 1, 2023, Mendenhall and others at RADD received an email notifying them that the bank declined to provide a line of credit because:

19

**The company looks to be losing $20 million repeatedly and covers the cost of operational expenses which are abnormally high through equity raises in the public market.** With that[,] our concerns with the latest financials is the trend continues and if [your] access to raise public or private funds dries up, the operational cost of the company is too great to support the current balance sheet. We took a deep analysis and wanted this to work, but with annual losses this large and consistent-it is just not possible. (emphasis added)

45. Vaughn also knew about RADD's grim financial condition. She was the ultimate supervisor for payroll across RADD, TSS, and related entities, and knew about the need to move money between entities under Mendenhall and Vaughn's control to cover expenses and delinquent obligations.

46. Moreover, RADD's own internal financial records show that its annual rental income never exceeded $5 million annually. They also reveal that RADD continuously generated losses and recorded net losses from 2020 through 2024—with annual losses of at least $31 million in 2022 and $22 million in 2023.

47. Despite RADD's perilous financial condition, Defendants continued soliciting investors in RADD stock, HML Notes, and JV Agreements while misrepresenting that RADD was profitable and had a net positive cash flow.

48. By 2024, RADD faced widespread mortgage defaults and before its filing for bankruptcy, faced at least 166 foreclosure actions totaling approximately $47 million.

20

b. RADD's Cashflow Could Not Support Defendants' Promises on the HML Notes and JV Agreements

49.    From at least 2022 to 2024, Defendants misrepresented to HML Notes and JV Agreement investors into believing that RADD had more than enough cash flow to pay the HML Notes and operate the JV properties to generate returns. Mendenhall touted RADD's outstanding financial condition, and both he and Vaughn stated that no RADD Inner Circle investors had ever lost money. Defendants' statements were misleading because RADD was relying on financing and raising new investor funds to operate and could not make interest or principal payments to HML Notes investors. Defendants also commingled investor proceeds from HML Notes and JV Agreements in RADD and TSS's operating accounts, used investor proceeds to cover RADD's operating costs, and failed to make property payments which resulted in the foreclosures.

c. RADD's Stock Price Was Illusory:  It Was Not Independently Valued, It Was Derived From Understated Mortgage Obligations, and It Was Not Updated

50.    Central to RADD's marketing was the purported upward trajectory of its stock price. RADD prominently featured its stock price on its website as evidence of its profitability, as seen here:

21



Stock Price Increase from 2019-2023

Past performance is not indicative of future results, no investment is guaranteed regardless of its past performance. Performance is based on the companies Regulation A offering that is currently not qualified.

51.    RADD's steadily rising stock price—from $10 to $25.04—was an illusion intended to deceive current and prospective investors. The price was based on unsupported real estate valuations that did not come from objective third-party appraisals, independent valuations, or external accountants' calculations—contrary to Defendants' representations—and utilized dramatically understated mortgage liabilities. For example, RADD's internal balance sheet for December 31, 2022, which RADD used to calculate its stock price, listed $41.4 million in mortgage debt, even though RADD's contemporaneous property finance records reflected $66 million in mortgage debt. Further, Defendants failed to update the stock price as promised to investors.

52.    RADD's Offering Materials specified how and when RADD's stock price would be determined. As explained in RADD's Offering Materials, RADD's stock price was rooted in the valuation of its net asset value ("NAV"). RADD calculated its NAV by adding up the fair value of all its properties, subtracting the

debt on those properties, and then adding any other assets and liabilities. The stock price was simply the NAV divided by the number of outstanding shares. Per the Offering Materials, to calculate its NAV, RADD was supposed to value each property in its portfolio quarterly by either an "objective independent third party appraiser" or "objective independent third party evaluator" to determine its fair value. Then, "external accountants" were supposed to work with RADD to calculate its stock price. RADD was also supposed to update its stock price and NAV every quarter, and sooner if a material event caused RADD's stock price to change by 5% or more.

53.    In a March 2022 video  entitled "Being Burned," Mendenhall, to engender investor trust, stated, "We have a third party that also does the assessment of all our assets, of all our values, of all our properties." This independent third-party appraiser assertion was repeated at presentations to investors during investor retreats.

54.    In a May 2024 video focusing on whether RADD was profitable, Mendenhall, after touting RADD's ever-increasing stock price being up to $25.04, stated, "That's what the numbers are. That's what the math is. And if I ever found that there was anything different in the math, then we would change the math. That's why there are CFOs, that's why there are accountants, that's why there's third-party, that's why there's auditors."

23

55. Sales scripts approved by Vaughn for use by RADD's sales agents touted RADD's stock price and included statements about RADD's use of third-party appraisers or evaluators to calculate RADD's NAV each quarter.

56. RADD also sent investors "Shareholder's Periodic Statement[s]" reflecting the purported current value and their investments' alleged growth based on the purported increase in RADD's stock price.

57. Defendants' representations about determining, calculating, and updating RADD's stock price were false. RADD did not obtain independent property appraisals or valuations for its properties. Instead, Mendenhall's brother, who was employed by RADD as its Vice President of Real Estate Operations, determined the value of RADD's real estate assets. Prior to joining RADD, Mendenhall's brother's work experience was largely working at two prominent chain restaurants. Mendenhall's brother and his team relied on superficial online estimates rather than accepted appraisal standards. Mendenhall's brother and his team did not maintain any records of how they determined property values sent to RADD's internal accountants. RADD's internal accountants just accepted those valuations at face value. And RADD also did not use external accountants to determine its stock price.

58. Indeed, RADD was suffering from a foreclosure epidemic which began in earnest in 2024. And despite widespread foreclosures—internal findings

24

showing the stock price was significantly overstated—Defendants failed to update the $25.04 stock price after July 2023 which was contrary to representations in the Offering Materials about quarterly and event-driven updates. Defendants never updated RADD's stock price beyond July 2023.

59. The inflated stock price inured to the benefit of Mendenhall and Vaughn as co-owners of RAD Management, which was entitled to a performance fee equal to 20% of the increase in the NAV. The higher the NAV, the more fees paid to RAD Management, enriching Mendenhall and Vaughn. For example, Mendenhall and Vaughn, through RAD Management, used a purported increase in NAV and equity for the quarter ending December 2022 to charge RADD approximately $2.9 million in performance fees. RAD Management—Mendenhall and Vaughn—also calculated asset management fees equal to 2% of the NAV every year based on the inaccurate NAV amount.

d. RADD Was Not Liquid as Defendants Repeatedly Touted

60. Defendants told investors they could withdraw at least a portion of their investment if they followed the procedures laid out in the Offering Materials—filling out the requisite form and waiting the allotted six months—permitting redemption requests every January and June.

61. In a January 2023 video, Mendenhall stated, "It's their money. They should have access to it when they want to have it." In or around 2022, Vaughn

25

told at least one investor that he would have access to his money after the six-month holding period.

62.    Still, many investors were not paid even after complying with RADD's redemption requirements. After investors submitted redemption requests, Mendenhall, Vaughn, or both, determined whether and when those requests would be honored. Preference was given to large investors, investors planning to attend upcoming RADD events and those who repeatedly complained. Meanwhile, numerous investors either received no payment or were met with shifting explanations—such as supposed delays in the accounting department—or were given false assurances that funds were forthcoming. In reality, RADD lacked the financial capacity to honor redemption requests because of its deteriorating financial condition and Mendenhall's and Vaughn's misappropriation of investor funds.

63.    On February 2, 2024, RADD froze redemptions. Despite Defendants' representations that RADD would revisit its decision to freeze redemptions, RADD has not unfrozen redemptions. In January 2025, Mendenhall in fact berated investors for seeking redemptions, saying they were "attacking" RADD.

64.    At the time of the redemption freeze in February 2024, there were at least $3 million in redemption requests outstanding.

### 2. *Scheme To Defraud*

a. Mendenhall and Vaughn Diverted RADD Investor Funds to TSS

65.　　Mendenhall and Vaughn controlled RADD, TSS, and their bank accounts, and they commingled investor funds within and across these accounts. From January 2020 through at least March 2024, RADD received approximately $118 million of investor funds into its bank accounts. Defendants diverted a net of approximately $20 million of commingled investor funds from RADD's bank accounts to TSS's bank accounts. TSS also received about $34 million of investor funds that Mendenhall and Vaughn, unbeknownst to investors, diverted and commingled directly into TSS's bank accounts from investments in HML Notes and JV Agreements, together with fees to join the RADD Inner Circle program. While TSS had some legitimate income from education revenue, the vast majority of funds in TSS's bank accounts were commingled and diverted RADD investor funds.

66.　　Mendenhall and Vaughn knew that RADD Inner Circle funds were directed to TSS's bank accounts, that RADD funds were commingled in TSS's accounts, and that investors were not told their money would be used for payroll or personal expenses.

b.   <u>Mendenhall and Vaughn Misappropriated</u> <u>Millions of Dollars of Investor Funds</u>

67.   Mendenhall and Vaughn diverted millions of dollars from RADD's bank accounts and investor-funded TSS accounts for personal use, including private jets, luxury goods, jewelry, IRS tax payments, nanny services, and other personal expenditures. All of RADD's and TSS's bank accounts were jointly controlled by Mendenhall and Vaughn.

68.   During the Relevant Period, Mendenhall misappropriated at least $2.3 million in investor funds. He transferred at least $1.4 million from TSS's bank accounts to his personal accounts, paid from RADD's and TSS's accounts $691,000 to the IRS on his behalf, paid from TSS's accounts $75,000 to his nanny, and paid from TSS's account $197,000 in American Express ("AmEx") charges.

69.   Mendenhall's AmEx charges included more than $50,000 from a high-end custom clothier, more than $25,000 for AmEx gift cards, nearly $50,000 from high-end jewelers, and thousands of dollars in various expenses, including orthodontic charges, adult nightclub expenses, firearms ranges, outdoor sporting goods stores, and recreation such as golf and bowling, among others.

70.   Vaughn misappropriated at least $2.5 million in investor funds. She transferred $1.5 million from TSS's accounts to her personal accounts, paid from TSS's accounts $299,000 to the IRS on her behalf, and paid from TSS's account at least $747,000 in AmEx charges.

71.     Vaughn's AmEx charges included more than $214,000 in private jet charters, approximately $173,000 from high-end fashion clothing and accessories stores, approximately $80,000 from jewelry stores, approximately $40,000 from adult nightclubs, approximately $15,000 in AmEx gift cards, approximately $15,000 in Ticketmaster charges, and thousands of dollars for various other expenses, including to a luxury car dealership, private school, orthodontics, pet supplies and spa, exercise equipment, and a pawn shop, among others.

72.     While RADD's offering circular and PPMs stated that Mendenhall and Vaughn were entitled to salaries as well as management fees upon RADD meeting certain financial benchmarks, these payments for the benefit of Mendenhall and Vaughn from RADD and TSS using commingled investor funds were not designated as salary or management fee payments. And, as described below, Mendenhall himself publicly stated several times that neither he nor Vaughn received salary or management fees in 2023 or 2024, and Vaughn emphasized to investors the sacrifices she had purportedly made for them.

73.     During a December 28, 2024, video question-and-answer session with investors, Mendenhall stated, "So [RADD] is focused on taking steps we believe will improve our financial condition and protect our assets. Amy Vaughn and Dutch Mendenhall as leaders have deferred their personal offer (*sic*) salaries for the company for all of 2023 and 2024 calendar year."

29

74.     In a January 2025 update video call to investors, Mendenhall stated that he and Vaughn had deferred all management fees until the redemption freeze would be lifted, and reiterated it by later stating:

> Ladies and gentlemen, I have deferred all salary for all of 2023 and 2024. Right? Because at the end of the day, my true wealth is built up in this. And if this survives and succeeds, then I'm a very, very wealthy man. If it doesn't, then I'm an entrepreneur who's building my business and building my wealth. And so that's—thus is life. Right? Cool.

### 3.  RADD's Status

75.      In April 2025, Mendenhall and Vaughn finally told investors via video that the company was preparing to file for Chapter 11 bankruptcy. In the same video, they asked investors to provide $20,000 to keep RADD operational.

76.     On March 1, 2026, RADD, along with four affiliated entities, filed its Voluntary Petition for Bankruptcy. The filing placed over 300 properties—single family homes and vacant lots—under court supervision. Thereafter, the U.S. Trustee's Office moved for the appointment of an Examiner, which was granted.

## V.     CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### (Against All Defendants)

77.     The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

78.     By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

79.     By reason of the foregoing, Defendants, directly or indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Section 17(a)(2) of the Securities Act
**(Against All Defendants)**

80.     The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

81.     By engaging in the conduct described herein, and as alleged in Paragraphs 37 through 64 above, from approximately November 2019 through March 2024, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts

31

necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

82.   By reason of the foregoing, Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**COUNT III**

**Violations of Section 17(a)(3) of the Securities Act**
**(Against All Defendants)**

83.   The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

84.   By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

85.   By reason of the foregoing,  Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)
### (Against All Defendants)

86.    The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

87.    By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

88.    By reason of the foregoing,  Defendants, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

## COUNT V

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against All Defendants)

89.    The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

33

90. By engaging in the conduct described herein, and as alleged in Paragraphs 37 through 64 above, from approximately November 2019 through March 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91. By reason of the foregoing, Defendants, directly and indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

## COUNT VI

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)
**(Against All Defendants)**

92. The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

93. By engaging in the conduct described herein, and as alleged in Paragraphs 65 through 76 above, from approximately November 2019 through March 2024, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the

34

purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

94.     By reason of the foregoing, Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VII

### Violations of Sections 5(a) and 5(c) of the Securities Act in the HML Notes Offering (Against All Defendants)

95.     The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

96.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the HML Notes' securities and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

97.     Starting no later than November 2019 and continuing through at least March 2024, Defendants, directly and indirectly, (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a

prospectus or otherwise; (b) carried or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

98.     By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT VIII

### Unjust Enrichment
### (Against Relief Defendant)

99.     The Commission repeats and realleges Paragraphs 1 through 76 of this Complaint.

100.    As a result of Defendants' fraudulent conduct described herein, and as alleged in Paragraphs 23, 26, 49, and 65 through 76 above, TSS obtained investor funds without a legitimate claim to those funds. Under those circumstances, it is not just, equitable, or considerable for TSS to retain the funds. TSS was unjustly enriched.

## VI.   RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests the Court find Defendants committed the violations alleged, and

### A.   Permanent Injunction Against Defendants

Issue Permanent Injunctions enjoining Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77(e)(a) and (c); § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### B.   Conduct-Based Injunction Against Mendenhall and Vaughn

Issue Conduct-Based Injunctions enjoining Mendenhall and Vaughn from directly or indirectly, including, but not limited to, through any entity owned or controlled by Mendenhall or Vaughn, respectively, from participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Mendenhall or Vaughn from purchasing or selling securities for each of their respective own personal accounts.

### C.   Disgorgement and Prejudgment Interest Against Defendants and Relief Defendant

Issue an order directing Defendants and Relief Defendant to disgorge all ill-gotten gains or proceeds received with prejudgment interest thereon, resulting from the acts and/or courses of conduct alleged in this Complaint, pursuant to

Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. § 78(d)(3), (5), and (7)].

### D.  Civil Monetary Penalties Against Mendenhall and Vaughn

Issue an order directing Mendenhall and Vaughn to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### E.  Officer and Director Bar Against Mendenhall and Vaughn

Issue an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Mendenhall and Vaughn from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

### F.  Further Relief Against Defendants and Relief Defendant

Grant such other and further relief as may be necessary and appropriate.

## VII.    DEMAND FOR JURY TRIAL

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated:  July 29, 2026                                         Respectfully submitted:

By: /s/ *Russell Koonin*
     Russell Koonin
     Acting Supervisory Trial Counsel
     Fla. Bar No. 474479
     Direct: (305) 982-6390
     Kooninr@sec.gov
     *Lead Counsel*

     Michael Mikulic
     Trial Counsel
     Fla. Bar No. 125073
     Direct: (305) 982-6353
     Mikulicm@sec.gov

     Attorneys for Plaintiff
     **SECURITIES      AND      EXCHANGE
     COMMISSION**
     801 Brickell Avenue, Suite 1950
     Miami, FL 33131
     Telephone:  (305) 982-6300